# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE GILCHRIST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PHILIP MORRIS INTERNATIONAL INC., ANDRÉ CALANTZOPOULOS, MARTIN G. KING, and JACEK OLCZAK,<br><br>Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Wayne Gilchrist ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon an investigation conducted by and through Plaintiff's attorneys, which included, *inter alia*, a review of United States Securities and Exchange Commissions ("SEC") filings by Philip Morris International Inc. ("Philip Morris" or the "Company"), conference call transcripts, press releases and other public statements, and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Philip Morris common stock between February 8, 2018 and April 18, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Philip Morris and certain of its officers and/or directors (collectively, "Defendants").

2.      Philip Morris is one of the world's largest tobacco companies, producing several top selling cigarette brands.  Through its subsidiaries and affiliates, Philip Morris is engaged in the manufacture and sale of cigarettes, tobacco products, and other nicotine-containing products, including heated tobacco units, outside the United States.  The Company is well-known worldwide for its best-selling product, Marlboro cigarettes.

3.      Large tobacco manufacturers have been under the threat of declining sales volumes for decades.  In particular, over the last several years, Philip Morris has been facing stagnant or negative sales trends due to a decrease in smoking percentages worldwide.  Throughout the Class Period, the Company reassured investors that its sales initiatives were combatting this decline and that favorable sales trends at the end of 2017 were continuing through the first quarter of 2018.

4.      As alleged herein, these statements were materially false and misleading when made because Defendants knew, or recklessly disregarded, that: (i) Philip Morris was experiencing a faster decline in cigarette and heated tobacco sales volumes during the first quarter of 2018 than investors had been led to believe, (ii) the Company's highly-touted heated tobacco sales initiatives had faltered, and (iii) the Company was experiencing adverse sales headwinds in key markets. As a result of these misrepresentations, Philip Morris stock traded at artificially inflated price levels throughout the Class Period.

5.     The Class Period begins on February 8, 2018 to coincide with the Company's issuance of a press release announcing results for the fourth quarter and year ended December 31, 2017.  In the press release, Philip Morris informed investors that negative sales trends due to declining smoking percentages worldwide would be offset by new sales initiatives and that favorable sales trends at the end of 2017 had continued into the first quarter of 2018.

6.     With the price of Philip Morris stock artificially inflated, Company insiders sold millions of dollars' worth of their own Philip Morris shareholdings.  For example, on February 22, 2018—one day after the Company made positive statements about its ongoing sales trends and projected favorable results to investors—André Calantzopoulos ("Calantzopoulos"), Philip Morris's Chief Executive Officer ("CEO"), sold 49,000 shares of Philip Morris stock at $103.66 per share for over $5 million in proceeds.  In addition to the questionable timing, Calantzopoulos's sale was unusual because it represented a greater than 22% increase over the next greatest number of shares he had sold in a single day during at least the previous five years.

7.     Thereafter, on April 19, 2018, the Company issued a press release announcing disappointing first quarter 2018 financial results, including stalled growth in key sales initiatives. The Company reported that combined cigarette and heated tobacco unit shipment volumes in the first quarter of 2018 had declined by 2.3% compared to the prior year's first quarter. Key sales initiatives fared particularly poorly, as Philip Morris's heated tobacco unit growth plateaued due to market demographics and faltering consumer conversion tactics, and, further, cigarette shipments fell by 5.3% during the quarter, signaling persistent adverse trends for the Company.

8.     On this news, the price of Philip Morris common stock fell more than 15%, from a close of $101.44 per share on April 18, 2018, to close at $85.64 on April 19, 2018. This decline marked the Company's largest one-day drop since 2008 and a closing price more than 17% below

the price at which the Defendant Calantzopoulos sold his Philip Morris stock less than two months prior.

9.     As a result of Defendants' wrongful acts and omissions, Plaintiff and other Class Members purchased Philip Morris common stock at artificially inflated prices.  After the above revelations entered the market, the price of Philp Morris stock dropped by nearly 22% from its Class Period high, causing Plaintiff and other Class members to suffer significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Philip Morris is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.  Defendants' wrongful conduct, including the false and/or misleading statements described herein, emanated from within this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. Philip Morris common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "PM."

## PARTIES

14.     Plaintiff Wayne Gilchrist, as set forth in the accompanying certification, incorporated by reference herein, purchased Philip Morris common stock at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant Philip Morris is a Virginia corporation with its principle executive offices located at 120 Park Avenue, New York, New York 10017.

16.     Defendant Andre Calantzopoulos ("Calantzopoulos") is and, throughout the Class Period, was the Chief Executive Officer ("CEO") & Director of Philip Morris beginning in May 8, 2013 and through the Class Period.

17.     Defendant Martin G. King ("King") is and, throughout the Class Period, was the Chief Financial Officer ("CFO") of Philip Morris beginning in January 2018 and through the Class Period.

18.     Defendant Jacek Olczak ("Olczak") is and, throughout the Class Period, was the Chief Operating Officer ("COO") of Philip Morris beginning in January 2018 and through the Class Period.

19.     Defendants Calantzopoulos, King, and Olczak are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Philip Morris's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers, and institutional investors, *i.e.* the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not

been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Philip Morris is one of the world's largest tobacco companies, producing several top selling cigarette brands, including its best-selling brand, Marlboro. Philip Morris is a holding company engaged, through its subsidiaries and affiliates, in the manufacture and sale of cigarettes, tobacco products, and other nicotine-containing products outside the United States.  In 2008, the Company was spun off from operating company Altria Group, Inc., which focuses on the sale of tobacco products inside the United States.

21.     As the number of smokers has decreased globally, large tobacco companies, such as Philip Morris, have been faced with the threat of declining sales volumes, offset somewhat by population growth.  Tobacco companies have relied on price increases to compensate for falling volumes and to sustain revenues and profits.  In order to increase sales volumes and market share, companies such as Philip Morris have also begun developing alternative smokeless (including heated tobacco) products.  Using these strategies, Philip Morris was able to increase annual net revenues from $73.9 billion in fiscal 2015 to $78.1 billion in fiscal 2017, an increase of over 5%.

22.     Philip Morris's revenues are driven by two primary categories of tobacco products: (i) cigarettes, including the Company's well-known traditional brands such as Marlboro, and (ii) "reduced-risk products," including heated tobacco units. The vast majority of Philip Morris's sales derive from cigarettes as heated tobacco units were only recently introduced by the Company. Between 2016 and 2017, the Company's total cigarette shipment volumes decreased from approximately 812.9 billion units to approximately 761.9 billion units.  During this same time,

sales of the Company's heated tobacco products increased from approximately 7.4 billion units to over 36.2 billion units. Given this, it was critically important to investors and the Company's long-term prospects that Philip Morris continue to increase sales of its heated tobacco units and stop the decline of cigarette sales volumes.

**Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on February 8, 2018, to coincide with the Company's issuance of a press release announcing its results for the fourth quarter and year ended December 31, 2017 ("FY 2017 Press Release").  The FY 2017 Press Release informed investors that reported net revenues, excluding excise taxes, had increased 7.7% for the year to $28.7 billion, up 9.4% year-over-year excluding unfavorable currency impacts.  For the fourth quarter 2017, the Company touted a 3.8% increase in cigarette and heated tobacco unit shipment volumes to 212.1 billion and informed investors that its net revenues, excluding excise taxes, had increased by 19% to $8.3 billion. The FY 2017 Press Release also included a 2018 full-year forecast that projected net revenue growth of over 8%, excluding excise taxes and excluding currency.

24.     Commenting on the financial results in the FY 2017 Press Release, Defendant Calantzopoulos represented that the Company's strong momentum from its fourth quarter results had carried into the new year and set a "strong foundation" in traditional cigarette sales and for accelerating growth in heated tobacco units.

25.     Specifically, Calantzopoulos attributed Philip Morris's strong 2017 fourth quarter performance to "[t]he excellent performance of [its] flagship smoke-free product IQOS -- not only in Asia, but also in the vast majority of [its] launch geographies" and stated that this excellent performance "underscored [the Company's] great promise and the commitment of [its] employees to lead the transformation of [the] industry towards a smoke-free future."   In addition, Calantzopoulos stated that "*[c]ontinued investment behind IQOS in 2018 is expected to further*

***drive its positive momentum***."[1]   Calantzopoulos continued: "The confirmed potential of our smoke-free alternatives reinforces our strong determination to deploy all necessary resources to accelerate their growth, which will drive our business success and ability to generously reward our shareholders over the long term."

26.     That same day, Philip Morris held a conference call with analysts and investors to discuss the Company's financial results and operations.   During the call, Defendant Calantzopoulos stated the following with regard to the Company's continued improvement in total sales volume in the fourth quarter:

> ***The sequential improvement in our quarterly volume performance continued in the fourth quarter***, with heated tobacco unit growth driving a total shipment volume increase of 3.8%, or 1.4% excluding inventory movement.
>
> * * *
>
> While our total cigarette share declined by 3.7 points last year, ***we recorded strong sequential share growth beginning in the second quarter***.

27.     Defendant Calantzopoulos represented that these favorable growth trends would continue and drive favorable growth in 2018, claiming that the "robust business performance in 2017 underscored the enormous promise of reduced-risk products" and reiterating that "IQOS is performing exceptionally, demonstrating the importance of our investments and our ability to transfer and apply learnings across markets."   Calantzopoulos also highlighted the Company's "highest annual net revenue growth, excluding currency and acquisitions, since our spinoff in 2008."

28.     During the call, Calantzopoulos touted the Company's "spectacular performance" in Japan, which he represented was driven by heated tobacco sales, and informed investors that

---

[1]     All emphases herein are added unless otherwise indicated.

"total shipment volume increased by 13.1%" in the country.  Calantzopoulos represented that the Company expected this demand to "*grow further in the first quarter*."

29.     When questioned about increased inventory shipments to Japan and the size of the market opportunity, Calantzopoulos stated:

> Look, we had to build these inventories for the reasons I explained. So *I don't see this decreasing. If I see anything, as the volume goes up, it has to be adjusted, obviously, upwards over time*. . . . The second one is, look, we have our own projection for total market in Japan, including obviously HeatSticks. *And there's nothing in the horizon that would cause any change in what happened in the previous years*.

30.     On February 13, 2018, Philip Morris filed its Annual Report on Form 10-K with the SEC (the "2017 10-K").  In the 2017 10-K, the Company restated the annual and quarterly financial results of "over 8.0%" net revenue growth that had previously been provided in the FY 2017 Press Release.  In the 2017 10-K, the Company also stated that favorable sequential sales trends experienced in the fourth quarter of 2017 had continued into the first quarter of 2018. For example, the Company informed investors that "favorable inventory movements were driven primarily by approximately 8.5 billion units net in Japan reflecting: *the increasing demand for HeatSticks [is] anticipated to further increase in the first quarter of 2018* . . . ."

31.     On February 21, 2018, all Individual Defendants presented on behalf of Philip Morris at the Consumer Analyst Group of New York Conference.  At the conference, Defendant Calantzopoulos stated that the Company was "progressing" on various initiatives "to accelerate growth" in heated tobacco unit sales. Referring to Philip Morris common stock as a "*growth stock*," Calantzopoulos told investors that "*8%-plus currency-neutral net revenue growth is not just a 2017 or 2018 phenomenon*" for the Company, but would likely continue into the future based on existing trends and initiatives in the business.  According to Calantzopoulos, "*returns on our investment to accelerate consumer switching this year will mostly be realized next year,*

further improving our year-over-year comparisons. So EPS results in 2019 are very likely to be better than those this year."

32.     Using Japan to demonstrate the purported success of the Company's sales initiatives to increase heated tobacco unit volumes, Defendant Olczak informed investors that: "As the understanding of the category and its benefits are established in adult smoker's communities, ***IQOS starts enjoying word of mouth, as adult smokers share experiences with friends and peers***. Although this varies according to countries and cultures, it is universally true." He further represented that the Company planned to go "deeper with IQOS into our existing launch markets," including Japan, and "further deploy [the Company's] many learnings across these markets to accelerate growth."

33.     Olczak further represented that accelerating growth trends at the end of 2017 had continued into 2018, stating:

> [W]e recorded sequential growth in our heated tobacco unit national market shares in 2017. ***This growth trend continued in January of 2018*** with standout performances in Korea, Portugal, and Romania. There was a similar growth trend in the focus area offtake shares for our markets that are more targeted geographically.
>
> ***This strong growth continued in January. Our weekly offtake shares in Japan continued to grow in January both nationally and in the prefectures where the heated tobacco category is the most mature from a competitive standpoint***: Fukuoka, Sendai, and Tokyo. In Sendai specifically, our weekly offtake share growth in January drove further growth in our heated tobacco category share. In fact, the category's growth was driven primarily by IQOS.
>
> ***Our strong share performances for IQOS continue to be underpinned by high IQOS switching across markets. This generally reflects rates of full and predominant conversion, ranging from around 70% to 90%.***
>
> IQOS switching rates . . . in certain markets are beginning to reflect the emerging presence of competition in the heated tobacco category, as IQOS purchasers experiment with newly available products, even if just temporarily. The most obvious example is Japan, where there are now several heated tobacco products.

34.     As shown in the slides below, which were included with Defendants' presentation, the Company purported to demonstrate that Philip Morris had rapidly expanded its heated tobacco unit sales in Japan and had continued to increase market share in the first quarter of 2018, as a result of the success of its sales initiatives and the conversion of adult smokers:







## IQOS: *HeatSticks* Offtake Share Growth Continues in Japan

Weekly Offtake Shares (%)

| Week ending: | 2017 Jan-29 | 2017 Jul-2 | 2017 Dec-31 | 2018 Jan-28 | Variance Jan-28 vs. Dec-31 |
|---|---|---|---|---|---|
| Fukuoka | 7.5 | 11.5 | 15.1 | 16.0 | +0.9pp |
| Sendai | 13.0 | 17.2 | 20.0 | 20.5 | +0.5pp |
| Tokyo | 9.5 | 14.9 | 17.7 | 18.6 | +0.9pp |
| National | 7.7 | 12.8 | 16.2 | 16.8 | +0.6pp |

Note: Offtake share represents select C-Store sales volume for *HeatSticks* as a percentage of the total retail sales volume for cigarettes and heated tobacco units
Source: PMI Financials or estimates

45

35.    The statements contained in ¶¶ 23-34 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) favorable sales growth trends experienced by the Company in the fourth quarter of 2017 had not been sustained through the first quarter of 2018; (ii) declines in the Company's cigarette shipments had accelerated on a sequential basis in the first quarter of 2018; (iii) shipments of the Company's heated-tobacco units were on track to decline 39% sequentially in the first quarter of 2018; (iv) the Company's sales initiatives to convert adult smokers in Japan to heated tobacco units had stalled, and the Company's near-term growth prospects in key Japanese markets had plateaued; (v) the Company's market share for its heated tobacco category in Japan was declining in February 2018 and favorable growth trends had not been sustained; (vi) new product sales initiatives and attempts to generate revenue through price increases would not be able to sustainably offset declining sales volumes in the Company's

11

combustible products as had been presented to investors; and (v) as a result of the foregoing, the Company was not on track to sustain currency neutral revenue growth of above 8% for 2018 or 2019, and such estimates lacked a reasonable basis.

36.      Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  The failure of the 2017 10-K to disclose the facts listed in ¶ 35 violated 17 C.F.R. § 229.303(a)(3)(ii) because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenue, and income from continuing operations.

## The Truth Begins to Emerge

37.      The truth began to emerge on April 19, 2018, when Philip Morris announced disappointing first quarter 2018 financial results in a press release (the "1Q18 Release"). The Company revealed that cigarette and heated tobacco unit shipment volumes had declined 2.3% to 173.8 billion units, significantly worse than the consensus estimates of a total volume decline of only 0.6%.  In addition, the Company's cigarette volumes declined by 5.3%, despite being compared against an 11.5% decline from the prior-year quarter.

38.      The 1Q18 Release revealed that the company would not achieve net revenue growth greater than 8%, notwithstanding Calantzopoulos' mid-quarter statement that "8%-plus currency-neutral net revenue growth is not just a 2017 or 2018 phenomenon."  Later, in connection with its second quarter 2018 results, Philip Morris revealed it was only on track to achieve 3% to 4% projected currency neutral net revenue growth for 2018.

39.      The 1Q18 Release further revealed that growth had slowed in the same key Japan markets previously touted by Defendants. The Company announced that its heated tobacco unit

sales had been particularly poor, with quarterly sales of only 9.6 billion units compared to consensus estimates of 13.2 billion units—a sequential decline of nearly 39%.  In Japan, despite earlier projections of continued growth, the Company experienced "less-rapid-than-initially-projected growth in sales of devices to consumers in Japan in the first quarter" caused in part by difficulty in converting "more conservative adult smoker segments who may require, at least at first, slightly more time for adoption."

40.     On an earnings call that same day, Defendant King admitted that sales of heated tobacco units in Japan had reached a "plateau" as the Company's sales initiatives has stalled.   In contrast to previous representations about growing demand, Defendant King stated that Philip Morris's increased shipments to Japan at the end of 2017 had come close to "saturating the early adopters and innovators."

41.     Defendant King also revealed that in Japan, the Company had achieved a market share of 15.8% in the first quarter of 2018, and a market share in March of 15.6%, meaning that February must have been the worst month of the quarter.

42.     On this news, the price of Philip Morris common stock fell over 15%, from a close of $101.44 per share on April 18, 2018, to close at $85.64 per share on April 19, 2018, on abnormally large trading volume of more than 45 million shares.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of all persons who purchased Philip Morris common stock during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the directors and officers of Philip Morris, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Philip Morris common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Philip Morris and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  These shares are held by hundreds or thousands of individuals located geographically throughout the country.  Joinder would be highly impracticable.

45.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include:

a.      Whether the Exchange Act was violated by Defendants;

b.      Whether Defendants omitted and/or misrepresented material facts;

c.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.      Whether the prices of Philip Morris common stock were artificially inflated during the Class Period; and

f.      The extent of damage sustained by Class members and the appropriate measure of damages.

46.     Plaintiff's claims are typical of the claims of the members of the Class because all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

48.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

49.     During the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Philip Morris common stock, as detailed herein, and operated as a fraud or deceit on Class Period purchasers of Philip Morris common stock.   Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Philip Morris common stock fell precipitously, as the prior artificial inflation came out of the price. The decline in Philip Morris's stock price was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to

artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## SCIENTER ALLEGATIONS

50.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants: (i) knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; (ii) knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

51.     The Individual Defendants permitted Philip Morris to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

52.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Philip Morris, their control over, receipt, and/or modification of Philip Morris's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Philip Morris, participated in the fraudulent scheme alleged herein.

53.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Philip Morris common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding the Company's sales initiatives and growth in key markets, including its increase in revenues despite declining cigarette sales,

continued growth and increased sales of heated tobacco products, its financial prospects, and the intrinsic value of Philip Morris's common stock, and caused Plaintiff and members of the Class to purchase Philip Morris's common stock at artificially inflated prices.

54.     In addition, the suspicious timing and nature of the sales of Philip Morris stock during the Class Period by Company insiders adds to the indicia of scienter.  As described herein, on February 22, 2018, Defendant Calantzopoulos sold 49,000 shares of Philip Morris stock at $103.66 per share, allowing him to reap more than $5 million in proceeds. Calantzopoulos' sale occurred: (i) only one day after he made materially false and misleading statements to the market as alleged herein; (ii) more than halfway through the Company's disappointing first quarter of 2018; (iii) near peak trading prices during the Class Period; and (iv) at more than $18 above the price Philip Morris shares fell to after revelations of the truth entered the market. In addition, the sale was the largest made by Calantzopoulos in his position as CEO of the Company and more than 22% above his next largest sale of Philip Morris stock in at least the preceding five years.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

55.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.     The omissions and misrepresentations were material;

c.     Philip Morris's common stock traded in an efficient market;

d.     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Philip Morris's common stock; and

e.       Plaintiff and other members of the Class purchased Philip Morris common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

56.     At all relevant times, the market for Philip Morris common stock was efficient for the following reasons, among others: (i) as a regulated issuer, Philip Morris filed periodic public reports with the SEC; and (ii) Philip Morris regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## NO SAFE HARBOR

57.     Defendants' verbal and written "Safe Harbor" warnings accompanying its oral and written forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

58.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Philip Morris who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, Philip Morris and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.     Philip Morris and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Philip Morris common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are named as primary violators and participants in the wrongful and illegal conduct charged herein.

62.     As a result of the foregoing, the market price of Philip Morris common stock was artificially inflated during the Class Period.  In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described herein and/or the integrity of the market price of Philip Morris common stock during the Class Period in purchasing Philip Morris common stock at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

63.     Had Plaintiff and the other members of the Class been aware that the market price of Philip Morris common stock had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information that the Company and the Individual Defendants did not disclose, they would not have purchased Philip Morris common stock at the artificially inflated prices that they did, or at all.

64.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

67.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company that had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to

cause the Company to engage in the wrongful acts complained of herein.   The Individual Defendants therefore, were "controlling person[s]" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Philip Morris common stock.

69.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a class representative under Rule 23 and Plaintiff's Counsel as Lead Counsel;

b.      Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 25, 2018                          Respectfully submitted,

                                        By:     *S/ Naumon A. Amjed*
                                                Naumon A. Amjed
                                                Ryan T. Degnan

Melissa L. Troutner
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
mtroutner@ktmc.com

*Attorneys for Plaintiff*

## CERTIFICATION

I, Wayne Gilchrist ("Plaintiff"), declare that:

1.      Plaintiff has reviewed the Complaint and authorizes its filing.

2.      Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is not dependent upon execution of this Certification.

4.      Plaintiff's Class Period purchase and sale transaction(s) in **Philip Morris International Inc.** securities that are the subject of this action are attached in Schedule A. Plaintiff has complete authority to bring a suit to recover for investment losses for all securities set forth in Schedule A.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this date: _OCTOBER 24, 2018_

_Wayne Gilchrist_
Wayne Gilchrist

## SCHEDULE A

| Security | Buy/Sell | Date | Quantity | Price |
| --- | --- | --- | --- | --- |
| Common Stock | Buy | 4/11/2018 | 10.732 | $100.93 |